Mark W. **STEARNES,** Plaintiff–Appellant,

v.

**BAUR'S OPERA HOUSE, INCORPORATED,** doing business as Baur's Opera House, a Delaware Corporation, Defendant–Appellee.

No. 92–2196.

United States Court of Appeals, Seventh Circuit.

Argued Feb. 24, 1993.

Decided Sept. 1, 1993.

Rehearing and Suggestion for Rehearing En Banc Denied Nov. 15, 1993.

Robert G. Heckenkamp, Duane D. Young, Steven C. Ward, argued, Heckenkamp, Simhauser & Labarre, Springfield, IL, for plaintiff-appellant.

Bradley Scott McMillan, argued, Heyl, Royster, Voelker & Allen, Peoria, IL, Michael B. Metnick, Metnick, Barewin, Wise & Cherry, Springfield, IL, Karen L. Kendall, Gary S. Schwab, Heyl, Royster, Voelker & Allen, Springfield, IL, for defendant-appellee.

Before BAUER, Chief Judge, RIPPLE, and KANNE, Circuit Judges.

BAUER, Chief Judge.

Does the Civil Rights Act of 1964, 42 U.S.C. § 2000a, guarantee a particular type or, better yet, "color" of music? Mark Stearnes asks us to answer this question. Specifically, Stearnes sued Baur's Opera House for alleged violations of his federal civil rights and Illinois law. Stearnes claims that Baur's engaged in a pattern or practice of racial discrimination by playing music that he and other black persons would not find appealing with the deliberate purpose of driving black customers from the premises. The district court granted Baur's motion for summary judgment, and dismissed the case with prejudice. 788 F.Supp. 375 Because Stearnes failed to notify the appropriate state agency as required by 42 U.S.C. § 2000a–3(c) before he filed his case in federal court, we remand the case to the district

court and order the case dismissed for lack of jurisdiction.

## I.

Baur's Opera House is a bar located in Springfield, Illinois. Baur's patrons dance to tunes spun by a disc jockey. On February 4, 1990, at about 1:00 a.m., Stearnes entered Baur's, paid a two dollar cover charge, and joined Barbara Curry and other friends.[1] About an hour later, five to ten people, all of them black, went to the dance floor area. A few minutes after they started dancing, the disc jockey began playing music that "wasn't very danceable." Ex. A to R. Doc. 69. Curry, a black woman, described the music as "hard rock." Ex. B to R. Doc. 69. Curry approached Baur's manager and asked him why the music had changed. Curry told the manager that "it was mostly blacks in there from one o'clock until three o'clock till they close, so we would like to hear some of our songs." *Id.* Curry stated that the manager informed her that Baur's changed the music because it wanted to keep blacks out. *Id.* Curry then returned to her table and told Stearnes what the manager had said. Later, near closing time, one of Baur's bouncers came to Curry's table and told her, Stearnes, and those sitting with them to leave. Ex. A to R. Doc. 69; Ex. 7 to R. Doc. 68. The bouncer also called them "niggers." Ex. B to R. Doc. 69. Curry and her friends refused to leave, giving as a reason that they were not "niggers" and therefore must not have been the parties the bouncer addressed. At this, the bouncer left, returned with another bouncer, and again told them to leave. They continued to object and refused to leave. After more words were exchanged, they decided to leave. As they were leaving, one of the bouncers shoved Stearnes from behind. More racial slurs followed before Stearnes turned around and took a swing at one of the bouncers. The punch did not connect; Stearnes and the bouncer were too far apart. The bouncers then jumped Stearnes, wrestled him to the ground, and held him there. Twenty minutes later, the police arrived and arrested Stearnes.

[1] Our recitation of the evening's events of February 4, 1990 and Baur's music policy reflects a version of the facts set forth in only those affidavits that support Stearnes' allegations.

According to former Baur's disc jockey Brad Schroeder, Baur's owner George Baur had become concerned that Baur's was becoming a "nigger bar." Ex. F to R. Doc. 69. George Baur apparently could tolerate up to ten percent blacks, but no more. *Id.* Accordingly, when an unacceptably high number of blacks came to Baur's, manager Kim Koratsky would tell disc jockeys that it was getting "too dark in here." *Id.* Koratsky used this phrase to instruct the disc jockeys to stop playing rap music and start playing hard rock. The music switch effectively emptied the dance floor, which Koratsky had nicknamed "Zimbabwe West." Ex. G to R. Doc. 69. The switch in music was intended to drive blacks from the bar. Ex. B to R. Doc. 69. Apparently, rap music was considered "black music." Correspondingly, hard rock music was considered "white music." This happened every weekend at Baur's "just like clockwork." Ex. G to R. Doc. 69.[2]

Stearnes sued Baur's for alleged violations of the Civil Rights Act of 1964, 42 U.S.C. § 2000a ("the Act" or "Title II"). Specifically, Stearnes alleged that Baur's engaged in a pattern or practice of discrimination with the intent, purpose, and effect of denying blacks the ability to use and enjoy Baur's on the same basis as whites.[3] Stearnes did not, however, notify the Illinois Department of Human Rights before he filed his lawsuit.

## II.

We are required to satisfy ourselves not only of our own jurisdiction, but also the jurisdiction of the district court. *Mitchell v. Maurer*, 293 U.S. 237, 244, 55 S.Ct. 162, 165, 79 L.Ed. 338 (1934); *Krueger v. Cartwright*, 996 F.2d 928 (7th Cir.1993). It is our duty to raise and consider the issue of jurisdiction *sua sponte* when it appears from the record that jurisdiction is lacking. *Id.* The requirements of Section 2000a–3(c) are jurisdictional and, unless those requirements are met, the federal courts do not have jurisdiction to decide the dispute.

Section 2000a–3(c) requires that Title II plaintiffs give notice to state or local authorities when a state or local law prohibits such discrimination and the state or local authority is authorized to grant or seek relief from such discrimination.[4] We therefore examine Illinois law to see if Illinois has a state or local authority authorized to grant or seek relief for an alleged violation of Title II.

The Illinois Human Rights Act ("the Act") provides that it is Illinois public policy "[t]o secure for all individuals within Illinois the freedom from discrimination because of race [or] color ... in connection with ... the

---

2. In a memorandum to Baur's disc jockeys, Baur's manager Kim Koratsky described Baur's music policy, in pertinent part, as follows:

   RAP MUSIC: Under no circumstances is any rap tune, or video, to be played that has not been expressly approved by management. This is intended to apply to tunes previously and currently being played. All rap music will be approved on a song-by-song basis. The cut is not to be "crowd tested," or played in whole, or in part, without approval. All music you wish approved should be set aside and presented to the manager, who will review them. Information regarding the current, or past, placement on the charts would be helpful in this decision.

     *   *   *   *   *   *

   GOALS: Our goal is to provide something for everybody. As such, you should avoid falling into the trap of playing just one style of music. You will undoubtedly be unable to beat-mix the whole evening's music; I am willing to pay that price in order to bring variety to the booth.

   Ex. F. to R. Doc. 69.

3. We note that the alleged facts, if true, indicate that Stearnes and Baur's share one thing: they both have exhibited racist attitudes. Stearnes assumes that there is a correlation between race and musical preferences. Baur's, by its music-changing policy, makes the same assumption.

4. In full, section 2000a–3(c) provides:

   (c) In the case of an alleged act or practice prohibited by this subchapter which occurs in a State, or political subdivision of a State, which has a State or local law prohibiting such act or practice and establishing or authorizing a State or local authority to grant or seek relief from such practice or to institute criminal proceedings with respect thereto upon receiving notice thereof, no civil action may be brought under subsection (a) of this section before the expiration of thirty days after written notice of such alleged act or practice has been given to the appropriate State or local authority by registered mail or in person, provided that the court may stay proceedings in such civil action pending the termination of State or local enforcement proceedings.

availability of public accommodations." 775 I.L.C.S. 5/1–102(A). To achieve this end, Illinois has established a Department of Human Rights which has the power to file complaints with the Illinois Human Rights Commission in conformity with the Act. 775 I.L.C.S. 5/7–101(D). *See also* 775 I.L.C.S. 5/8–101, 5/8–102 (establishing the Illinois Human Rights Commission and enumerating its powers and duties). Further, Illinois law makes it illegal to "[d]eny or refuse to another the full and equal enjoyment of the facilities and services of any public place of accommodation."[5] 775 I.L.C.S. 5/5–102(A). A party alleging violations of the Act must notify the Department of Human Rights "[w]ithin 180 days after the date that a civil rights violation allegedly has been committed." 775 I.L.C.S. 5/7A–102(A)(1).

In this case, Stearnes admits that he did not notify the Department of Human Rights or any other state or local authority before he filed this suit in federal court. Stearnes filed his complaint on January 21, 1991, more than 180 days after the alleged discriminatory acts occurred. Stearnes argues that at the time he filed his complaint, there was no state or local authority that was empowered to hear his claim because the 180–day deadline had passed. He adds that 42 U.S.C. § 2000a–6(a) supports his contention that a "viable" state agency must have existed at the time he filed suit.[6]

Stearnes' argument is without merit; a "viable" state agency *did* exist and Stearnes failed to notify it. The plaintiff in *Harris v. Ericson*, 457 F.2d 765 (10th Cir.1972), made exactly the same claim. In that case, the plaintiff alleged that the defendant violated the public accommodation provisions of 42 U.S.C. § 2000a. *Id.* at 765. The *Harris* plaintiff conceded that he did not give notice of the alleged acts of discrimination to the relevant state human rights commission as required by section 2000a–3(c). He admit-

ted, as Stearnes does, that he missed the state deadline for filing such claims and that it was too late to give notice. The *Harris* plaintiff argued that the provisions of section 2000a–6(a) permitted the bringing of the action even though the plaintiff bypassed the state agency. *Id.* at 766. The Tenth Circuit rejected that contention and concluded that section 2000a–3(c) requires that "before federal action of the particular type with which we are here concerned be commenced, the state must be given the *opportunity* to invoke its remedies." *Id.* at 767. The court noted that section 2000a–3(c) "requires that no action shall be brought under that particular section of [the Civil Rights Act of 1964] before the expiration of thirty days after notice of such alleged discriminatory act has been given the appropriate state agency; whereas § 2000a–6(a) simply provides that one who, for example, has given notice to the appropriate state agency need not thereafter exhaust such remedy before the district court acquires jurisdiction." *Id.* The court therefore affirmed the district court's dismissal of the plaintiff's complaint.

A Title II plaintiff must demonstrate that he or she has met the procedural prerequisites of section 2000a–3(c) prior to filing suit in federal court. *Hornick v. Noyes,* 708 F.2d 321, 323 (7th Cir.1983), *cert. denied,* 465 U.S. 1031, 104 S.Ct. 1295, 79 L.Ed.2d 696 (1984). We find *Harris* persuasive and agree that failure to notify the appropriate state agency when one exists dooms a Title II plaintiff's case. In this case, Stearnes did not notify the Illinois Department of Human Rights before he filed his complaint in federal court. By his omission, he failed to comply with the requirements of section 2000a–3(c).

### III.

We remand the case to the district court and order the case dismissed for lack of jurisdiction.

---

5. Illinois defines a place of public accommodation as "a business, accommodation, refreshment, entertainment, recreation, or transportation facility of any kind, whether licensed or not, whose goods, services, facilities, privileges, advantages or accommodations are extended, offered, sold, or otherwise made available to the public." 775 I.L.C.S. 5/5–101(A). Baur's easily satisfies this definition and is a place of public accommodation for purposes of Illinois law.

6. Section 2000a–6(a) provides that "[t]he district courts of the United States shall have jurisdiction of proceedings instituted pursuant to this subchapter and shall exercise the same without regard to whether the aggrieved party shall have exhausted any administrative or other remedies that may be provided by law." 42 U.S.C. § 2000a–6(a).

RIPPLE, Circuit Judge, I join Part II of the court's opinion.